Case number 14-5205, Sierra Club Appellant v. United States Army Corps of Engineers et al. Mr. Hayes for the Appellant, Mr. Gray for the Appellees. Good morning and may it please the Court, my name is Douglas Hayes on behalf of Sierra Club Appellants in this matter. I'd like to reserve two minutes of my time for rebuttal. As you know, this case involves the Enbridge-Flanagan South crude oil pipeline, which was constructed between four states following the approval of various federal agencies. Now, the actions in this case include 33 easements across federal properties, four decisions by the Army Corps of Engineers to approve almost 2,000 water crossings across four states, and a decision by the Fish and Wildlife Service to allow the take of two endangered species in the species habitat, which was implemented by the Corps. Let me ask you a preliminary question, because Enbridge says this whole thing is moot, the pipeline is finished, it's already operational, so why isn't it moot? Thank you. First of all, it's important to note that the government does not also make that argument. The test in this circuit and other circuits is whether, even if a NEPA project is complete, whether the agencies retain the authority to impose additional mitigation measures and at least provide partial relief, and that's true in this case. The government hasn't disputed that it has that authority to impose additional mitigation measures. But what kind of mitigation measures might it impose? Under what authority? Under the authority under the Clean Water Act, under the easement granting statutes. So because the verifications are conditioned on continuing serving of the public interest in all the various conditions therein, or are you talking about the separate permitting of the BIA lands and that? That's correct. The Clean Water Act statute and regulations allow the Corps to impose mitigation measures throughout the life of the project. And just to give you an example of the type of mitigation measures we're talking about, the Environmental Protection Agency in this case is worried about oil spills. They're worried not just the catastrophic oil spills like we saw in the Enbridge pipeline in Michigan, but the EPA was referring to up to 2% of a pipeline's volume could go undetected by the spill response system. And that's, with a pipeline of this size, that's up to 500,000 gallons a day that could go undetected. So EPA suggested several additional mitigation measures, including monitoring wells in sensitive areas, different shutoff valves, spill response equipment. All of these were mitigation measures that EPA was urging the Corps to take, but were never considered in the NEPA analysis. Those were not considered in the national permit because no party raised them, is that right? So to what extent is that preserved? The oil spills were never considered in the national, nationwide permit itself. And in fact, that document said in our appendix at page 316, that document even says NEPA requires more than this. You can't just look at the impacts of fill to waterways. And it says all additional impacts would be analyzed for certain projects at the project level. So even nationwide permit 12 itself anticipated additional impacts to be analyzed at the project level. That was never done here. Meaning the verification? The verifications. And in this case, we're looking at the verifications, the Fish and Wildlife Service action, but also the easements. There were 33 easements that were analyzed in three separate EAs. Now, the connected action regulations in this case, under NEPA... Putting aside connected actions just for a moment, was the risk of oil spills considered in those environmental assessments? It was, but it was limited to those actual easement areas. Those parcels. That's correct. But measures required or not? No. Not the mitigation measures that EPA was asking for, exactly. For example, EPA was specifically concerned, even within those areas, was concerned about sensitive areas like the upper Mississippi River watershed. Those mitigation measures to protect those areas were not implemented in this case. But it's important to... The government and Enbridge go to great lengths to talk about how oil pipelines, as a whole, are not major federal actions, per se. But in this case, there's no question that there has been major federal action and that NEPA regulations apply. The easements were major federal action. The district court acknowledged that. Therefore, the connected action regulations apply. The government and Enbridge have made clear in their disputes that none of these various federal actions would have independent utility. So based on the Delaware Riverkeeper case in this court and decades of segmentation connected action case law in this circuit, at least those federal actions had to be analyzed in the same way. But Riverkeeper is a case that involves FERC, and FERC has authority over the whole of the state. So it's to me different than a case where the action agencies have a very minimal role to play here. Something like between 2 and 4 percent of this whole pipeline, and the rest of it's on private land. Which is in that 2 to 4 percent is not in one discrete area. It's separated across the entire pipeline. But I think to answer your question, it's important to break that into two parts. Delaware Riverkeeper holds that various federal actions taking to approve a single project need to have independent utility if they're to be looked at separately. So for at least the federal actions in this case, the easements, the other areas within federal jurisdiction, those are connected. What I think you're asking... I'm sorry, I didn't want to interrupt. Go ahead. I think the second part is whether the non-federal or areas outside of the federal jurisdiction should be included in that analysis. And the answer to that is yes, as well. But just as an initial matter, at least the federal actions that were analyzed here, the areas within federal jurisdiction, the connected action regulations in Delaware Riverkeeper and Hammond v. Norton all require that these federal actions be analyzed together. There's some appeal to that, but I'm not sure that I see that as something that you were pressing in the district court. You sort of have these concentric claims. One is at least group all the NEPA evaluations that were going on with respect to the federally controlled or permanent or supervised lands together in one package. And then you have the broader claim about covering the private scope. And I guess we'll get onto that with the biological opinion. But the smaller claim, is that something you pressed in the district court? It is. It was in our complaint. We alleged that each of these federal actions individually triggered NEPA, but also that all of the federal actions and the non-federal parts of the pipeline should have been analyzed together. And I think... Right. And the non-federal, but the sort of lesser included claim that just if we only concede that we're going to look at the federal parts, those should be done together. That's a claim that I feel, I perceive as somewhat new. I think the district court's opinion sort of mischaracterizes what our claim, and does just talk about whether the whole pipeline is a measure of federal action. Whether the whole analysis, the whole pipeline should have been considered together. But our complaint alleges that each of these actions, federal actions, should have been analyzed together. Doesn't your approach to this nullify all the benefits of the general permit authority? Because my understanding of that is that NEPA is considered when that's done in the first instance. And it sounds like you're saying, then you have to go back and do it all again. No, your honor. I don't think it does nullify the benefits. I mean, the nationwide permit 12 was never intended for projects of this magnitude. Now, when you have 2,000 water crossings being lumped together, and you have the court implementing an Endangered Species Act take, and then you have connected to that 33 easements, at least in this situation, all of these federal actions should have been analyzed together. This is not a situation where we're simply asking for a handful of water crossings to be looked at together. Let me ask you with respect to the, really, I guess the incidental take statement, but all of them. I mean, there's something a little perverse about saying, well, the incidental take statement is with respect to the entire pipeline, public and private, and we know that the Ninth Circuit has viewed incidental take statements as triggering NEPA review, so there's some authority out there. But then when you think about this on the ground, what is the review that that action should trigger? So the action is, let's protect species along the pipeline. If that's a federal action triggering environmental review, what about that conduct that is safe-harbored by the ITS needs to be analyzed for environmental impact? It itself is an environmental protection measure. The Fish and Wildlife Service consultation and the incidental take statement is looking at whether or not this will jeopardize the existence of a species. That's an entirely different question as to what the impacts are on these species and whether, in light of that, whether or not the project should go forward. So, of course, the Fish and Wildlife Service has discretion that would be informed by NEPA to impose certain reasonable and prudent measures to minimize those impacts. But then the Corps... And has done so. That's correct, but those were not part of any NEPA process. But then it's up to the Corps, in this case, to decide, in light of that, whether to go forward with the project. And even when the Corps is verifying projects under Nationwide Permit 12, the district engineers are required to look at the entire project and decide whether they will have more than a minimal impact on the environment. In this case, that included the impacts to endangered species. So, it's not the monitoring that's been put in place pursuant to the ITS that you're worried is going to cause environmental impact. It's that... Or is it? Well, that's one thing that would be informed by a NEPA analysis. The monitoring, of course, is not monitoring just for the sake of monitoring. It's because there are ongoing environmental impacts from the operation of the pipeline, from the permanent maintenance of a right-of-way through everything in its path for 600 miles. None of these impacts were ever analyzed by any agency. What do they do to monitor? Do they drive trucks along? Do they do helicopters? Do they motorbike up and down? I believe there are... Some of the Corps areas talk about monitoring from the air. There's also on-the-ground monitoring. There's monitoring for revegetation of parts of the right-of-way and so forth. So, they're not checking on beetles from the helicopters, are they? I don't believe so, Your Honor. So, they're actually going on-site, presumably? Yes. Along the entire route of the pipeline, not just in the jurisdictional areas. And it looks like my time is up. If I could, I'm trying to understand your argument, or the best authority you have for your argument that under the connected action analysis, you look at the non-federal actions as well. The CEQ, the NEPA regulations at 40 CFR 1508.25, talk about not only connected actions, but cumulative actions. 1508, 40 CFR 1508.7, specifically states that that includes the cumulative effects of federal and non-federal actions. There are the Corps' own NEPA scoping regulations talk about when their control and responsibility has to be extended to upland areas. The public citizen case cites the 1508.7 regulation talking about. So, all of these, and of course, the Delaware Riverkeeper case in this circuit talked about use that regulation to say all of the cumulative, even if the connected action regulation didn't apply, these are all cumulatively actions that should have been analyzed together. So, those are all, again, that's sort of the second question. First is, the federal actions should have been analyzed together, but then, clearly, this is all part of one interdependent project, and all of these NEPA regulations together are intended to prevent an agency from breaking it up into thousands of pieces and to look at the entire project. Can you address Ramsey and San Luis and explain how you think the logic of those cases most governs your case? Is this a Ramsey case? Is this a San Luis case? Sure. So, the question as to whether, and first of all, the question as to whether or not the Fish and Wildlife Service action itself, standing alone, would have triggered NEPA is, in this case, again, we know that there is NEPA that was triggered by the easements, and that should bring in the federal... That is, with respect to the entire pipeline, public and private, is the incidental take statement that I'm aware of. The biological opinion. Yes. That gets the whole thing, public and private. That's partly why I'm interested in that and whether that is a federal action, triggered a federal action, itself brings on a NEPA review. Ramsey said that under the very broad definition of major federal action, it includes any sort of... It's not just a permit. It's any sort of federal regulatory approval that allows a project to go forward. Now, Ramsey said, in this case, it's functionally equivalent to a permit, but the reasoning was because the project would essentially be prohibited if not for that action. Because there, it was taking the fish. Was that the fish case? Yes, it was the fish case. It was a state-run fish program that would have taken species. Whereas here, that's not really true. I mean, if Emergen wanted to go ahead and the agencies had wanted to go ahead at their peril, they could have. There's no sort of actual prohibition. It's just an opinion. To safe harbor, they'd rather have that protection, but they could have gone forward in light of... They could not have gone through 600 acres of Indiana bat habitat as the project was proposed. They could not have taken species of bat and beetles. They were liable for it, but they could have gone ahead. Once consultation is implemented as it was in this case, the Corps is prevented by its  This is not a case where it's an entirely private actor that is trying to get a Section 10 permit under the Endangered Species Act, for example. This is a case where they needed federal actions before the project could be built. And in fact, that was what triggered consultation. And those federal actions could not go forward until the consultation was complete in this case. So... This has a fairly... There's a fairly small amount of this project that is under federal jurisdiction. And I'm wondering, do you think there's any limit to this? In other words, if there is a need for federal easements at all in a project, crossing of constitute major federal action and mean that all of these NEPA provisions have to be taken into account. In other words, where is the... Is there any line where it's so private, there's so little federal involvement that you would not argue that? Sure. And there are several cases that talk about what I think is commonly called the small The Winnebago case involved a core utility line that crossed a single waterway. And the court there said, you don't have to look at everything outside of that. Well, in this case, we're not talking about one aspect of federal involvement. We're talking about 35 easements spread through... Approved by various agencies. We're talking about over 2,000 waterways spread along the entire project's length. And then, of course, the endangered species impacts. So I don't think this court needs to worry about a bright line rule. I think in this case, there's enough federal involvement that not a single mile of this pipeline could be constructed without federal approval. We do worry about what the rule is, though. And we really are very conscious of the... I know you want to win the case for your clients, but it does feel like you're saying, well, at least in this situation where there's ABCD&E, there should be NEPA. And we're really trying to get a handle on how do we articulate something that's useful for all these different actors going forward. And it would be helpful if you had any guidance on what sort of is the tipping point or what is the line, as Judge Brown was asking. Sure. Well, I think the... Again, I don't mean to repeat myself, but again, at least all of the federal actions in this case should have been analyzed together. So that's a starting point. And then from there, the question is whether or not the rest of the pipeline should be analyzed. And I think, again, the core regulations, one of the factors to determine whether it needs to go outside of the boundaries is to the extent of whether there's cumulative federal involvement. The government never responds to that regulation. Isn't it more collective? I thought cumulative is kind of over time. And when they talk about the need with public action that's cumulative on top of private, like background private ambient noise, and then when something that's subject to regulation is added on top of that sort of sequentially, is this really a situation of cumulative or is it just collective? It's both. Of course, one of the cumulative impacts of these thousands of individual pieces of the project is the larger project. Now, and then there's also, if you look at it in terms of the cumulative impacts of all those, I mean, one way of looking at it is it can be looked at like a game of Russian roulette. If you look at the oil spills across one federal property and analyze the risks and say the risks there would be minimal over X amount of years, well, that's a very different calculation if you add that up almost 2,000 times. And then if we're talking about other impacts, cumulative impacts to not just listed species but wildlife in general, habitat, fragmentation, so all of these impacts can be looked at or should be looked at under the cumulative effects regulation. Let me ask you just one more thing about the biological opinion. Can we think of a biological opinion as something that's available and required to be obtained by the agencies in their various disparate functions, but also something that's available, like if there were no agency involvement at all, Enbridge presumably could come to the Fish and Wildlife Service and say, we want some upfront analysis of Endangered Species Act. They could have done that, right? That's a different process that's set up under the Section 10 process where there's no federal action where a private actor is trying to get in. But here we can kind of see that as both layers operating at once because Enbridge, in fact, initiated this and was a participant in the consultation and came away with something that's similar to what it would have done had the federal agencies not been involved? Exactly. And the record shows that there was some back and forth on that, actually. The Enbridge Fish and Wildlife Service was going to limit the scope of their incidental take statement to the jurisdictional waterways, but that would have required Enbridge to also go out and get a Section 10 permit for the non-federal parts, and that would have caused the delay. So after some back and forth, Fish and Wildlife specifically decided to apply the incidental take statement in this case to the entire pipeline, including the non-federal areas, because otherwise Enbridge would have been liable for any take. And if this were 100% private, or all on private land, and Enbridge had come and gotten a biological opinion or incidental take statement under Section 10, would that be federal action requiring NEPA for the whole pipeline? It may be. I'm not sure exactly how the Section 10 works with respect to NEPA. I would think that if that is a federal action that allows the project to go forward, yes, I would think that the Fish and Wildlife Service or whatever agency is issuing that would have to analyze the impacts of the whole project. Just to make it a little harder, what if it isn't something that formally legally is required, but functionally Enbridge doesn't want to go at its peril? I mean, here didn't they not proceed and say we're spending millions a day  So, as I understand it, it's not legally required on 100% private. You can proceed at your peril, build away, face major liability for taking endangered species, or you can get this. Well, I mean, I think it's important. In this case, the project, as proposed, crosses hundreds of acres of endangered species habitat. So there's no question that that would violate the Endangered Species Act. They could not build and operate this pipeline without arming endangered species. And so even if that was entirely on private land, the same would be true there. They could certainly build it at their peril, but they would certainly be breaking the law in this case by taking endangered species and their protected habitat. Unless the court has any other questions? Thank you. Thank you. May it please the Court, my name is Michael Gray. I'm here on behalf of the Federal Defendants, and with me at the council table is David Coburn, who's the counsel for the interveners. I have a lot to cover, so I think maybe I'll start with the connected actions argument. And I do think that the focus of that argument in the district court, and even in the complaint where it's alleged in a single sentence, is that the federal actions add up to make the federal government responsible for non-federal actions. And I don't think that sort of Gestalt-type theory works here, where you have NEPA compliance for each of the federal actions, and the connected actions doctrine doesn't expand the federal responsibility to non-federal actions. And individually, you talk about the verifications, I don't think even the lesser argument that the federal actions had to be analyzed together works, which I don't think the argument was asserted fully, but I don't even think that works because you need some connected actions, and the verifications, the NEPA's done for that at the generic stage, and it's clear here that Nationwide Permit 12 was designed for exactly this situation. Was it, Mr. Gray? I'm really curious, how common is this? Are there a lot of pipelines out there that are passing over substantially private land that don't have a whole pipeline NEPA analysis? It's very common. Very common. It's one of the most commonly used nationwide permits out there. I think we looked at, for this version of it, and they're not all this big, but there's something like 180 different, and that's just the oil pipelines, and that's just the oil pipelines. And those are oil pipelines for which, I understand you're saying for which national permits are useful, but the bottom line of my question was, and which never had, under any other authority, a full pipeline NEPA analysis. And which are never challenged. I think the unusual thing here is that there's a challenge here, alleging that because you have a number of single and complete projects, that it transforms into some obligation to consider the full pipeline. The core is regulatory responsibility. It's focused on wetlands, and this is exactly the kind of project for the nationwide permit. If you look at the EA for the nationwide permit, it anticipates 7,900 of these crossings per year, almost 40,000 over the life of the permit. And so you look at each crossing as a separate and distant, it's a single and complete project. And if it falls within the terms of the permit, it works. And it's important here to keep in mind that the actual impacts are all temporary, except for the conversion of some forested wetlands into emergent wetlands, all of which is more than double offset with mitigation. And so the idea that just because there's a lot, there's a big impact here, I think is wrong. What they really want is to expand that and make the federal government responsible for the pipeline itself. Well, they're worried. I mean, they're very candid about what they're worried about. They're worried about spills. And your position is these things are so safe that even when we assume tens of thousands of these crossings, we don't even analyze the risk of oil spills. We just don't even analyze it because they're really so safe. Well, there's a separate agency, the pipeline. No, but I mean in the NEPA analysis under the national permitting. But the clean water, I mean, the Corps' regulatory responsibility is directed at impacts of fill material on the water. And oil spills are within the province of a different regulatory agency that has a regulatory approach where they have set the standards and the pipeline companies come in and say, well, here's our plan. We meet the standards. But they don't have any NEPA responsibilities. So when you're doing a national permit, you're not looking at oil spills in part because the only oil spills you would be concerned about would be those that would pollute waterways. And so if there's like a pipeline going over 100 miles of desert, that would be a zero for you because it's just not jurisdictionally relevant when you're doing a NEPA analysis from the perspective of the Clean Water Act. Right. I think that's right. Is that right? Yeah. The focus is what are the impacts of the fill materials on the water? I mean, here you're talking about mostly intermittent and ephemeral streams where essentially they dig a trench, and they lay the pipeline, and then they fill the trench back in. And so the impacts are entirely temporary. I had actually misunderstood. I had thought that when any entity of the government does a NEPA analysis, they do a kind of, you know, multi-topic. They look at all different environmental risks. They don't just look at the environmental risks that are relevant to their agency. But it sounds like when you're describing at least the nationwide permitting of the Clean Water Act, that the sort of ex-anti-NEPA analysis isn't sort of multifactored like that. Well, there is a public interest review component where they consider impacts under different statutory regimes. But it's certainly not the focus, and it's not the primary responsibility of the Corps, particularly where you have another agency. I mean, you have like in the Aracoma coal case from the Fourth Circuit, which is a coal mining case, where the Corps limits the consideration of its impacts to the fill in the water. And the coal mine itself and all the upland impacts outside of the waters aren't the Corps' responsibility because they're regulated by the state. And here Congress has chosen not to regulate the location and construction of these pipelines. And so the Corps doesn't have any cause to expand its regulatory responsibility. So it won't look at like the cultural and historic. I mean, if you go right by, you know, Tams and Donner's house, and that's not in the NEPA analysis when you're setting up the national permit. Well, I mean, a national permit is so broad that, you know, that's one of the things that could be considered by the district engineer in verifying that this, and if it came so close that it might require an individual permit, the district engineer could say, you know, this is not a situation where we're going to verify that this falls within the nationwide permit because of impacts to cultural resources. And so we think you need an individual permit. But here there's no allegation that any of these 2,000 water crossings wasn't within the terms of the permit. So if somebody had raised in the ex-anti-NEPA analysis for the national permit the risk of oil spills, if Sierra Club had come in and said, look, Russian roulette, you know, you add these separate pieces and you're going to get a serious risk of oil spills, is that something that the Corps would then have considered? I think it would have had to respond to the comment. I'm not sure how it would have responded. I don't think it would have been under any obligation to expand its NEPA analysis to consider that. And, you know, it wasn't raised here. I should probably talk a little bit about the biological opinion and incidental take statement. I do think that this is a much closer situation to the San Luis case than it is to Ramsey. You know, Ramsey is a very extraordinary case where you have a non-federal actor, a non-federal applicant that's engaging in an activity that, by its nature, is designed for the direct take of the species, fishing. And in that situation, the court said it's a functional equivalent of a permit, but even the Ninth Circuit has sort of limited that to its facts in the San Luis case and said as a general matter, these agencies aren't, the Fish and Wildlife Service and the National Marine Fishery Service aren't engaging in action that requires NEPA. I actually read the San Luis case a little bit differently, saying that the entity, the Fish and Wildlife Service, when it issues the biological opinion, is not engaging in federal action because the federal action is occurring downstream at the next stage when the agency implements that, and it was only because it was the implementing agency in Ramsey that that's where the responsibility fell. But it's saying that, you know, for example, here you have an incidental take statement that is dealing with the whole pipeline, and then whoever is implementing that, for example, in the verification process, it's becoming part of the verifications, there would be under San Luis, there would be... And that's where the NEPA compliance happened, through the verification process. But there's a kind of a circularity there because you have ex ante NEPA analysis  and in between you have this ITS that's happened, and so is there an obligation triggered? I mean, arguably under San Luis, there's an obligation triggered there because of the intervening federal action. I think you have to look at what the underlying action is, and so in San Luis, reclamation was engaging in a major federal action that required an EIS, and here the Corps isn't. So, you know, in San Luis, where they're engaging in a major federal action is the action agency's responsibility to comply with NEPA. Well, if there's no NEPA responsibility on the action agency because it's already taken care of, then the ITS doesn't transform it and expand it and require more NEPA analysis at that stage. So let's say that in our case that the ITS did require more, you know, in order to get in and look at the pipeline to check out the status of the beetles and the bats, you have to build, you know, 100 little extra dirt roads to access it, and a road along, you know, what didn't used to have one, that would be a federal action that would require more than just the mere verification. I think it's certainly possible that if the action agency accepted, well, let's just stipulate that that would be a major federal action. I mean, I don't know if it would, but let's just say it would. If the action agency accepted that and said, yes, okay, we're going to change the nature of our proposed action such that we're going to do these things that are now major federal actions, then yes, I think at that point, then the NEPA obligation attaches, and that's the, you know, the Consolidated Salmonid case, I think is the name of it. That's what happened in that case, but that's not what happened here. I mean, the ITS requires some monitoring on the part of the Corps, and so it didn't do anything to expand the NEPA obligations. So I think ultimately what we're dealing here with is a private undertaking, 96% of which is on private land, and with federal actions that essentially have no permanent impacts that aren't offset by some mitigation. And the district court correctly concluded that in that situation, the NEPA does not require the government to study the impacts of the full pipeline, and the district court should therefore be affirmed. Thank you. Thank you. Mr. Hayes, you have no time remaining. We'll give you two minutes if you need it. Thank you. I'll be very brief. One issue that I think there was some discussion about whether this idea of all the federal connected actions is something that we raised below, or if this is a new argument. Again, we did argue that below. It's in our complaint. But I think one thing that is important to note is that once what the district court here did was rule that any claims related to the easements at the preliminary injunction stage, the district court ruled that those claims weren't right. The district court needed to look at the easements before it could apply NEPA. Once those became right, the district court essentially held that it doesn't need to look at the actual easements and that they comply with NEPA regardless. So there are several issues with respect to those easements themselves that Sierra Club was never afforded the opportunity to raise in the district court. The scoping issues we did raise, that was an issue from the outset of this case. The district court ruled on that. And I think that's an error of law that we're asking the court to reverse. But there are also a lot of issues with respect to the sufficiency of the environmental assessments, the sufficiency of the analysis with respect to cumulative impacts, greenhouse gas emissions, the direct, indirect, and cumulative impacts contained in those EAs that we never had an opportunity to raise. And I think those, you would not be precluded from, I mean, I don't think the government would pretend that you would be precluded from bringing a separate case on the content of the environmental analyses. I think that what the district court said was, yeah, I assumed the scope of those and I took them into account. And, you know, the depth of them or the actual substance of them was something I didn't need to know, she says in her final opinion. And so I think that, you know, you're basically making a discretionary decision. To the extent you want to challenge those on their substance, do it in a different case. Well, but, Your Honor, once we filed a motion to supplement the complaint with those claims and the district court essentially ruled that these environmental assessments comply with NEPA. Did she rule that? Well, she ruled on, she said that the analysis, regardless of what the content of the analysis, we asserted those claims in our supplemental complaint, additional claims, and the district court ruled against that and dismissed our, or excuse me, issued some of our judgment against this, ruling that these environmental assessments need not be analyzed together with the other federal actions, but essentially that they complied with NEPA. So it would give us a pause to file a new complaint to assert all of these additional claims after the district court made such a finding. So, and I just want one other, the only other point that I want to make is that the question of whether the Army Corps of Engineers has to look at anything beyond simply the fill of wetlands, the ocean advocates in Sigler cases that we cite in our briefs, they talk about the Army Corps of Engineers has to look at not just the 404 fill actions, but also the operation of the project, and that includes the risk of oil spills. So for those reasons, we're asking the court to reverse the district court and require NEPA analysis of all the federal actions. Thank you. Thank you. The case will be submitted.
judges: Brown, Pillard, Wilkins